Cornele A. **OVERSTREET, Regional Director, for the Twenty-eighth Region of the National Labor Relations Board, for and on behalf of the National Labor Relation Board, Petitioner,**

v.

**THOMAS DAVIS MEDICAL CENTERS, P.C., and Its Parent Corporation and Owner, F.P.A. Medical Management, Inc., Respondent.**

No. CV 97–488–TUC–WDB.

United States District Court,
D. Arizona.

Sept. 24, 1997.

Cornele A. Overstreet, National Labor Relations Board, Phoenix, AZ, pro se.

Robert J. Deeny, Gerard Morales, Gregg Jay Tucek, Snell & Wilmer L.L.P., Phoenix, AZ, for Respondent.

Susan Joan Martin, Daniel Lee Bonnett, William Karl Hylen, Martin & Bonnett PLLC, Phoenix, AZ, for Intervenor.

### ORDER GRANTING TEMPORARY INJUNCTION

WILLIAM D. BROWNING, District Judge.

This matter is before the Court pursuant to Petitioner's August 1, 1997, Petition for Temporary Injunction. The Court has jurisdiction pursuant to Section 10(j) of the National Labor Relations Act. 29 U.S.C. § 160(j).

The Respondents are Thomas Davis Medical Centers and its parent corporation and owner, FPA Medical Management, Inc.

Thomas Davis Medical Centers (TDMC) is an Arizona corporation, the shares of which are owned by a holding company which, in turn, is owned by FPA Medical Management, Inc. (FPA). The case involves a series of administrative hearings and motions for re-hearing and reconsideration all pertaining to efforts by the Federation of Physicians and Dentists/ AHPE, NUHHCE, AFSCME, AFL–CIO (the "Union") to organize and rep-resent the employees of the Respondents' entities. TDMC is a multi-specialty care fa-cility operating clinics throughout Tucson and elsewhere. In 1994, the physician share-holders of TDMC sold their medical practice to Foundation Health Medical Services ("Foundation") which sold its interest to FPA in November 1996. When Foundation ac-quired TDMC it created a wholly owned subsidiary, TDMS, which employed, for the purpose of this Petition, the support person-nel for the clinics. The allied health profes-sionals and physicians continued to be em-ployed by TDMC.

In September 1996, the Union filed a rep-resentation petition with the National Labor Relations Board (the "Board" or the "NLRB") under Section 9 of the National Labor Relations Act, as amended (the "Act") seeking to be certified as the physician's exclusive collective-bargaining representa-tive. TDMC and its then owner, Foundation, objected to certification and a hearing was held in late September 1996. At that hear-ing the parties agreed that the Union was a labor organization within the meaning of the Act, that the employer was subject to the jurisdiction of the NLRB and satisfied juris-dictional requirements regarding interstate commerce. At the three day hearing, which commenced September 26, 1996, TDMC ob-jected to certification alleging that its physi-cians were both managerial and supervisory employees who are excluded from organizing under the Act. TDMC's objection originally contained a contention that the physicians supervised the aforesaid TDMS support per-sonnel. That contention was explicitly with-drawn at the hearing, and therefore no evi-dence was adduced on that point. In June 1996, FPA and Foundation entered a Stock and Note Purchase Agreement providing that FPA would purchase the stock of TDMC. At the time of the September hear-ing, TDMC and Foundation were engaged in discussion with FPA for the sale of TDMC and closing was expected within 30 to 60 days. However, the sale did not close until December 1996 with an effective date of No-vember 1996.

## Standards for Relief under 29 U.S.C. § 160(j)

The merits of unfair labor practice charges are to be determined by the NLRB, subject to review by the appropriate appellate court. However "because administrative review can be slow, Congress provided the Board in Section 10(j) of the Act with the ability to petition a district court to enjoin alleged unfair practices pending Board review of the substantive evidence of those practices." *Ca-latrello v. "Automatic" Sprinkler Corp. of America,* 55 F.3d 208, 212 (6th Cir.1995).

In 1994, the Ninth Circuit abandoned the requirement that a court find reasonable cause to believe that an unfair labor practice had been committed, and at this time only requires that the court find that injunctive relief is "just and proper." *Miller v. Califor-nia Pacific Medical Ctr.,* 19 F.3d 449, 457 (9th Cir.1994). "[I]n determining whether interim relief under § 10(j) is 'just and prop-er,' district courts should consider traditional equitable criteria. They must do so, howev-er, through the prism of the underlying pur-pose of § 10(j), which is to protect the integ-rity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge." *Miller,* 19 F.3d at 459–60.

The traditional equitable criteria are: (1) the likelihood of the moving party's success on the merits; (2) the possibility of irrepara-ble injury to the moving party if relief is not granted; (3) the extent to which the balance of hardships favors the respective parties; and (4) in certain cases, whether the public interest will be advanced by granting the preliminary relief. *Miller,* 19 F.3d at 456. Under Ninth Circuit case law, the moving party must show "either (1) a combination of probable success on the merits and the possi-bility of irreparable harm, or (2) the exis-tence of serious questions going to the mer-its, the balance of hardships tipping sharply in its favor and at least a fair chance of

success on the merits. These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Id.*

In Section 10(j) actions the district court must focus on the underlying purposes of Section 10(j) while it balances the traditional equities listed above. Public interest is always an important factor in Section 10(j) actions. *Id.* at 460. In addition, the likelihood of success must be weighed against the possibility of irreparable injury and the Board must demonstrate a fair chance of success on the merits. *Id.* In assessing whether the Board has met this burden, it is necessary to factor in the district court's lack of jurisdiction over unfair labor practices and the considerable deference accorded to the NLRB by the court of appeals. *Miller,* 19 F.3d at 460. The judicial deference given to the Board is particularly strong when it makes determinations involving distinctions between supervisors and employees. *Providence Alaska Medical Center v. National Labor Relations Board,* 121 F.3d 548, 1997 WL 467495 (9th Cir.). Additionally, if the respondent admits the substance of the unfair labor practice charge or if the Board demonstrates that it is likely to prevail on the merits, the Ninth Circuit will presume irreparable injury. *Miller,* 19 F.3d at 460. However, if the charge is contested or the Board has only a fair chance of success on the merits, the court must evaluate the potential irreparable injury. *Id.* Furthermore, the district court must consider the probability that declining to issue the injunction will permit the allegedly unfair labor practice to reach fruition, rendering meaningless the Board's remedial authority. *Miller,* 19 F.3d at 460. Where the Board and the Respondent both make a showing of hardship, the court in its discretion must determine if the balance tips in the Board's favor. *Id.*

**Findings of Fact**

THE COURT FINDS specifically that FPA had actual knowledge of the NLRB proceedings. After TDMC/Foundation withdrew the claim that the physicians supervised the TDMS support staff, their remaining objections to the Representation Petition were 1)that the physicians supervised the TDMC allied healthcare employees, and 2)that because of its imminent sale to FPA the Representation Petition should be dismissed. At the time of the hearing there were seven allied healthcare employees which included physician assistants, RN practitioners and optometrists. The physicians, at that time, numbered one hundred and forty-five. Thereafter, on November 8, 1996, the Regional Director issued a Decision and Direction of Election, finding that a majority of the physicians were not supervisory or managerial employees and ordering that an election be held in the Unit.[1] TDMC/Foundation filed a Request for Review of that decision which was duly denied. After the Petition for Review but before the denial the Board conducted an election, impounding the ballots until the Board took action on the Request for Review.

On January 7, 1997, the Board issued an Order denying the Request for Review. On January 8, 1997, following the denial of the Request for Review TDMC/FPA filed a Motion for Rehearing and to Reopen the Record. The sole basis for this motion was the acquisition of TDMC by FPA, and Respondents did not specifically raise any of the other issues aforesaid. On January 17, 1997, the Board denied that motion. On January 23, 1997 the Regional Director tallied the ballots of the election which overwhelmingly voted for unionization and certification. On February 19, 1997, TDMC/FPA filed yet another motion for Rehearing and to Reopen the Record asserting that the physicians were indeed statutory supervisors. On March 18, 1997 this motion was denied as untimely and as not establishing the existence of newly discovered evidence. On May 5, 1997 TDMC filed a motion to Revoke Certification questioning the Unions qualification to act on behalf of the employees. That motion was denied on June 2, 1997. The Board has consistently found that the

---

1. The Regional Director found the appropriate collective-bargaining unit to be all regular full-time and part-time physicians, including department chairs, employed by TDMC in Pima County excluding other employees, physician medical directors, assistant medical directors, members of TDMC's Board of Directors, guards, and supervisors as defined in the Act.

question of supervisory and managerial status was fully litigated and that no sufficient cause existed for a reopening of the proceeding.

On February 3, 1997, the Union filed an unfair labor practice charge alleging TDMC's refusal to bargain, its direct dealing with physicians, and unilateral changes in the terms and conditions of employment. The charges were severed and considered in two separate cases. The first was the "refusal to bargain" case. Over objections, the Board granted summary judgment on this issue in July 1997. The Board found that the objections raised by Respondents were or could have been litigated in earlier proceedings and that no extraordinary circumstances or newly discovered evidence existed. The Board therefore declined to consider the objections and invoked the "no relitigation" rule. 29 C.F.R. § 102.67. That decision was appealed to the United States Court of Appeals for the District of Columbia Circuit. The remaining charges were consolidated with another case consisting of charges that TDMC has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(a)(1), (3) and (5) of the Act. The hearing on the consolidated cases commenced June 23 and, with adjournments, concluded on July 11, 1997. The Administrative Law Judge who heard those matters has received post hearing briefing and has taken the matter under advisement. The thrust of the objections by Respondents continue to focus on their tenacious assertion that TDMC physicians are supervisors. They further claim that an adverse finding would constitute a significant hardship in that it would involve losses of $1.5 million per month, as well as additional costs and losses in the course of its operation.

Petitioner seeks a temporary injunction pursuant to Section 10(j) of the Act pending the final disposition of the aforementioned consolidated cases. The changed conditions of employment, to which Petitioner takes exception, occurred on or about the dates indicated below and include but are not limited to the following acts and conduct:

(1) On December 26, 1996, requiring Unit employees to receive authorization before referring patients to other physicians of TDMC;

(2) On December 30, 1996, changing the professional liability insurance coverage for Unit employees by reducing applicable limits, instituting a $25,000 deductible, and eliminating input from Unit employees with respect to the settlement of claims brought against them;

(3) On January 30, requiring Unit employees to spend 36 hours working at TDMC's clinics in order to satisfy a 36–hour "patient contact" requirement;

(4) On February 19, reducing the amounts of bonuses paid to Unit employees by changing the formula used in the calculation of bonus compensation for Unit employees, retroactive to the 6–month period ending December 31, 1996;

(5) On February 19, changing its policy regarding coverage for Unit employees who work as hospital doctors ("hospitalists");

(6) In about February, increasing the panel sizes (the number of patients assigned to a physician) of Unit employees;

(7) On March 31, reducing the operating hours of its NW Urgent Care clinic by approximately 28 hours per week;

(8) On April 16, presenting Unit employees with new individual employment contracts covering their wages, hours, and other terms and conditions of employment;

(9) On May 30, announcing the elimination of evening hours at pediatric clinics;

(10) Since December 5, 1996, changing the compensation paid to employees;

(11) On April 30, establishing a "Regional Board of Governors" comprised of elected Unit employees to assist in the governance of TDMC, including the wages, hours, and other terms and conditions of employment of the Unit.

Although the Board demonstrated a clear likelihood of success on the merits, thus creating the presumption of irreparable injury, the Board made an traditional showing of irreparable injury resulting from the pervasive nature of the unfair labor practices. As of September 8, 1997, fifty-seven of the one hundred and forty five physicians had resigned their positions with TDMC, attendance at Union meetings had dropped off and

unit physicians had reluctantly signed new employment contracts without a meaningful opportunity for collective bargaining. As a newly certified union particularly vulnerable to unfair labor practices, the Union's majority support and bargaining strength have been diminished as a result of Respondent's unfair labor practices. If the unfair labor practices are allowed to continue any meaningful opportunity for collective bargaining will be destroyed.

The Court finds that in weighing the balance of hardships the Union will lose more should an injunction not be granted than the Respondent will lose if an injunction be granted. If Respondent is allowed to continue to engage in unfair labor practices during the pendency of the Board's process, the Court will in effect sanction the Respondent reaping the benefit of its own misconduct as well as allowing the frustration of the policies and remedial purposes of the Act. The imposition of a bargaining order is not unduly burdensome on Respondent because it is not permanent, and any agreement between the parties can contain a condition subsequent to take into account the possibility of the Board or the court of appeals rejecting the Regional Director's decision. Additionally, the bargaining order requires only that Respondent meet with the Union and bargain in good faith, it does not compel Respondent to agree to any particular terms or conditions of employment.

The public interest will be advanced by granting injunctive relief. In addition to diminishing the Union's bargaining strength and effectiveness, numerous physicians testified that patient care is severely undermined by the Respondent's unilateral changes. The unilateral changes that limit the physicians ability to properly care for their patients include, the new referral policy, the increased panel size, and increased hours. Therefore, the Court finds that injunctive relief is necessary to preserve the integrity of the collective bargaining process, to protect the quality of patient care and protect the community from the negative impact of the unfair labor practices.

## CONCLUSIONS OF LAW

Section 102.67(f) of the Board's Rules and Regulations provides that parties' failure to request review of the Regional Director's representation case decision or the Board's denial of a request for review "shall preclude such parties from relitigating, in any related subsequent unfair labor practice proceeding, any issue which was or could have been, raised in the representation proceeding." 29 C.F.R. § 102.67(f). This "no litigation" rule precludes a rehearing on the issue of managerial or supervisory employees and the COURT FINDS that the likelihood of the Respondent's success on its appeal is minimal. The law favoring finality of decisions in a case when an opportunity to be heard has been fully extended, precludes later attempts to merely relitigate issues which were or could have been litigated.

Furthermore, THE COURT FINDS that the four prong test for the granting of an injunction has been met. The balance of hardships clearly militates against Respondent and we find that the likelihood of success is clearly in favor of Petitioner.

Therefore, upon the entire record, IT IS **ORDERED** that, until further order of this Court, the Petition for Injunction is granted in the manner specifically set forth below:

Respondents, its officers, representatives, agents, servants, employees, attorneys, and all members and persons acting in concert or participation with it shall:

**Cease and desist from:**

1. Failing to recognize and bargain with the Union as the exclusive collective bargaining representative of the physician's unit as defined in the Regional Director's November 8, 1996 Decision and Direction of Election.

2. Making any unilateral changes in the terms and conditions of employment. The Court Finds specifically that the following unilateral practices are violative of the Act and are hereby enjoined:

   a. Changing the condition of salary and compensation of the Union employees;

   b. Changing policies regarding malpractice insurance;

   c. Changing the method for computing the work required to be performed by physicians;

d. Any change to the bargaining unit pertaining to leave, vacation, incentive pay formulations, hours of work required and policies that effect the hours worked, patient referral policies, and means for computation of hours required.

3. Bypassing the Union and bargaining directly with Unit employees.

4. Negotiating or requiring new employment contracts which have not been negotiated by the Union on behalf of the employees.

5. Discharging or threatening to discharge employees who insist on Union negotiated employment contract changes.

**Take the following affirmative actions:**

1. Upon request, recognize and bargain in good faith with the Union, as the exclusive collective-bargaining representative of the Unit employees, concerning wages, hours, and other terms and conditions of employment and, if any understanding is reached, embody the understanding in a signed agreement.

2. Upon request of the Union, rescind the unilateral changes made to the Unit employee's terms and conditions of employment, and restore Unit employee's terms and conditions of employment as they existed before December 5, 1996, including, but not limited to: the salary and compensation system of Unit employees; the malpractice insurance liability policy; the exclusion of hospital hours from the total number of hours required to be worked each week on "patient contact"; the policy for coverage for hospitalist doctors on vacation; the formula for calculating incentive pay retroactive to the 6–month period ending December 31, 1996; the patient referral process; the operating hours of Respondent's Urgent Care Centers; the pediatric clinic evening hours; panel sizes; and suspending the powers of the Regional Board of Governors.

3. As to those unit employees employed before December 5, 1996, upon request of the Union, rescind all individual employment contracts with those Unit employees entered into on or after December 5, 1996, and maintain in effect those terms and conditions which had been established in their individual employment contracts before December 5, 1996, pending bargaining in good faith with the Union to agreement or bona fide impasse concerning any proposed changes in those Unit employees' wages, benefits, or other terms and conditions of employment.

4. As to those Unit employees hired on or after December 5, 1996, upon request of the Union, rescind all of their individual employment contracts and bargain in good faith with the Union to agreement or impasse concerning their wages, benefits, or other terms and conditions of employment, and if agreement is reached, upon request, embody it in a signed agreement.

Petitioner also seeks mandatory temporary injunctive relief requiring Respondent to offer positions on the terms and conditions detailed above, to physician employees who left Respondent's employment after December 5, 1997. The Court does not feel it has the necessary factual predicate to grant this relief, either in whole or in part. However, the Court grants leave to any such physician to petition the Court for such relief.