**Louis J. D'AMICO, Regional director of Region 5 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,**

v.

**TOWNSEND CULINARY, INC., Respondent.**

No. Civ.A. AW 98–2673.

United States District Court, D. Maryland, Southern Division.

Sept. 30, 1998.

---

Gabriel A. Terrasa, Baltimore, MD, and Angela S. Anderson, Washington, DC, for petitioner Louis J. D'Amico.

Stanley B. Rohd, Towson, MD, Barry M. Willoughby, Wilmington, DE, for respondent Townsend Culinary, Inc.

Carey R. Butsavage, Marc A. Stefan, Washington, DC, for amicus curiae United Food and Commercial Workers Union, Local 400.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

### Introduction

Presently before the Court is a petition for interim injunctive relief under Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j). The Court has fully considered the petition, the transcript from the hearing held before an administrative law judge [1], exhibits, memoranda, and the arguments made by counsel before this Court. For the reasons that will follow, the Court will grant the petition in part, and deny it in part.

### Background

Petitioner is the Regional Director of Region 5 of the National Labor Relations Board ("Board"), and has filed this petition on its behalf. Respondent is a Delaware corporation, involved in the business of processing food products. On May 17, 1996, the employees of Respondent's Laurel, Maryland processing plant voted, by a margin of two to one, for union representation. On July 19, 1996, the Board certified the United Food & Commercial Workers Union, Local 400, AFL—CIO ("Union"), a labor organization within the meaning of Section 2(5) of the National Labor Relations Act, 29 U.S.C. § 152 et al. ("NLRA"), as representative of a collective bargaining unit. This unit was defined as:

> [A]ll full-time and regular part-time employees, including Thermo Processing Operations, employed by the employer at its Laurel, Maryland, facility; but excluding all truck drivers, casual and temporary employees, owners, managers, room super-

visors, confidential employees, owners, managers, room supervisors, confidential employees, guards and supervisors as defined by the Act.

Petitioner's Memorandum Exhibit 1 at 3.

Bargaining between Respondent and the Union occurred between January 1997 and October 22, 1997. On April 30, 1997, the parties submitted a set of final offers. In May of that year, the employees unanimously rejected Respondent's offer. On May 30, 1997, Respondent and Union again submitted final offers, but neither was accepted.

In October, 1997, Respondent and the Union had their last session, in front of a Federal Mediation and Conciliation Services mediator. No agreement was made. On November 21, 1997 Respondent withdrew recognition from the Union.

On December 1, 1997, Respondents implemented many improvements for its employees including a S.50 per hour pay increase, the reduction in the amount employees had to pay in terms of health insurance premiums, vacation benefits, and the conversion of some employees from a temporary to a permanent status. These improvements were better than anything ever offered to the Union by Respondent.

On March 11, 1998, Leonardo Palacios ("Palacios"), the head Union steward in the plant, was disciplined for allegedly violating Respondent's no solicitation and distribution policy. On March 13, 1998, allegedly in response to Palacios confusion over the terms of the policy, Carlos Holgado ("Holgado"), Respondent's Human Resources Director, posted a "clarification" to that policy. On April 21, 1998, Respondent discharged Palacios for allegedly violating the clarified policy.

The underlying case alleging, among other claims, unfair labor practices in violation of Section 8(a)(1), (3), and (5) of the NLRA is presently pending before Administrative Law Judge William Kocol. The hearing before Judge Kocol opened on May 12, 1998 and closed June 18, 1998.

---

1. For the purposes of this memorandum opinion, the transcript is cited as "Record".

Only a few of the allegations in the case before Judge Kocol are currently before the Court for the purposes of injunctive relief. According to Petitioner, "[t]he specific allegations for which injunctive relief is being sought from this court are Respondent's unlawful withdrawal of recognition from the Union, respondent's refusal to bargain in good faith, Respondent's unlawful discharge of Leonardo Palacios and Respondent's promulgation and enforcement of overly broad non distribution rules." Petitioner's Memorandum at 6–7.

On August 7, 1998, Petitioner filed the petition with this Court, and moved that the Court grant the petition on the basis of the transcript of the hearing before Judge Kocol. On August 11, 1998, the Union moved for the Court to allow it to submit an Amicus Curiae Brief. The Court granted that motion on September 2, 1998. On September 18, 1998, a hearing on the petition was held in open court. The Court did not conduct a formal evidentiary hearing; there was not any live testimony presented.

### Discussion

■ Petitioner seeks an injunction under Section 10(j) of the NLRA, which provides:

The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any district court of the United States ... within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper. 29 U.S.C. § 160(j).

The district courts are given the power to grant this relief because Congress recognized that:

by reason of lengthy hearings and litigation enforcing its orders, the Board has not been able in some instances to correct unfair labor practices until after substantial injury has been done.... Since the Board's orders are not self enforcing, it has sometimes been possible for persons violating the [NLRA] to accomplish their unlawful objective before being placed under any legal restraint and thereby making it impossible or not feasible to restore or preserve the status quo pending litigation.

S.Rep. No. 105, 80th Cong., 1st Sess. 8, 27 (1947).

The parties disagree about the appropriate analysis under which the determination of whether this injunction should issue must be made. The Circuits are split on this issue as well. In the pleadings, and at the hearing before this Court, Petitioner argued that the appropriate standard is a two-prong test which was discussed by the Fourth Circuit in *Humphrey v. International Longshoremen's Assn.*, 548 F.2d 494 (4th Cir.1977). Under this test, the Board must first demonstrate that it has "reasonable cause" to believe that an unfair labor practice has been committed. Then, the Board must establish that interim relief is "just and proper." *See id.* 548 F.2d at 497–98; *see also D'Amico v. Cox Creek Refining Co.*, 719 F.Supp. 403, 406–07 (D.Md.1989); *D'Amico v. A.G. Boone Co.*, 647 F.Supp. 1546, 1549 (W.D.Va.1986). The "reasonable cause" standard does not require the court to resolve the case on its merits. *International Longshoremen's Assn.*, 548 F.2d at 497. Instead, the standard requires the Court to determine whether the factual issues could be decided in the favor of the Petitioner. *Id.* 548 F.2d at 498. This standard does not measure the likelihood of success on the merits, but rather if there is any evidence "which together with all the reasonable inferences that might be drawn therefrom supports a conclusion that there is reasonable cause to believe violation has occurred." *Squillacote v. Graphic Arts International Union*, 540 F.2d 853, 858 (7th Cir.1976) (citations omitted).

■ Under the traditional reading of the "just and proper" standard, Petitioner does not have to show irreparable harm, but only that injunctive relief would restore the pre-violation status quo, serve the public interest, and further the remedial purposes of the act.

*See NLRB v. Aerovox Corp.*, 389 F.2d 475, 477 (4th Cir.1967) (applying Section 10(e) of the NLRA which contains the same "just and proper language") ("[T]he government is not required to show irreparable injury when it seeks an injunction to give effect to an act of Congress.").

Respondent argues that the appropriate standard to apply in this case is the traditional equitable four prong test, not the two prong test. Under the traditional equitable principles, a preliminary injunction is an extraordinary remedy that only should be issued when the Plaintiff (here Petitioner) clearly establishes its entitlement to such relief. *See Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir.1997). The standards for injunctive relief in the Fourth Circuit are well known. In *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc.*, 550 F.2d 189 (4th Cir.1977), the Fourth Circuit explained that the most important factors a district court must consider in deciding whether to grant injunctive relief are the threat of irreparable harm to the plaintiff should the Court not issue an injunction, and the likely harm to the defendant (here Respondent) if an injunction is ordered. *See id.* 550 F.2d at 196. The district court must balance these two factors. *See Manning*, 119 F.3d at 263. After doing this balancing, the court may consider the third factor, which is the plaintiff's likelihood of success on the merits. *See id.* As the balance of harm moves in favor of the defendant, the plaintiff has a greater burden in showing its likelihood of success. *See id.* Finally, the Court considers the fourth factor, the public interest. *See id.*

In addition to arguing that the traditional four prong standard should be applied, Respondent also argues that the "reasonable cause" prong should be completely abandoned. Respondent has support for this contention.

Although Section 10(j) contains the "just and proper" language, it does not reference "reasonable cause." A district court has thoroughly analyzed the history of relief granted under Section 10(j). *See D'Amico v. United States Serv. Indus., Inc.*, 867 F.Supp. 1075 (D.D.C.1994). The Court stated that the

> threshold "reasonable cause" inquiry was adopted by some courts from Section 10(*l*) of the NLRA, 29 U.S.C. § 160(*l*),. as an additional requirement for a Section 10(j) injunction, but one less onerous than the more traditional likelihood of success on the merits standard. Section 10(*l*) was enacted at the same time as Section 10(j) and governs situations where a charge has been filed with the Board alleging that one or more specifically enumerated unfair labor practices has occurred....
>
> Although there is no similar "reasonable cause" language in Section 10(j), many courts traditionally have incorporated Section 10(*l*)'s "reasonable cause" standard into their Section 10(j) analysis to determine when a Section 10(j) temporary injunction is appropriate.... Courts have applied the "reasonable cause" standard to Section 10(j) petitions, rather than the familiar and traditional likelihood of success/balancing of harms test, as a way of acknowledging the legislative judgment that District Courts in Section 10(j) situations, just as in Section 10(*l*) situations, lack authority to decide the merits of the unfair labor practice charge and to emphasize the judicial view that the processes and judgments of the Board, which has primary jurisdiction over such charges, deserve respect and deference.

*United States Serv. Indus., Inc.*, 867 F.Supp. at 1081–82 (citations omitted).

The Seventh Circuit and the Ninth Circuit have recently rejected the "reasonable cause" test, and have read the "just and proper language" to include the traditional equitable standards. *See Miller v. California Pacific Med. Ctr.*, 19 F.3d 449 (9th Cir. 1994) (en banc); *Kinney v. Pioneer Press*, 881 F.2d 485 (7th Cir.1989) The First and Second Circuits have retained the "reasonable cause" prong, but apply the traditional equitable criteria when considering the "just and proper" prong. *See Maram ex rel. NLRB v. Universidad Interamericana de Puerto Rico, Inc.*, 722 F.2d 953, 958 (1st Cir.1983); *Silverman v. 40–41 Realty Assoc.*, 668 F.2d 678 (2d Cir.1982).

The Fourth Circuit has not made a proclamation that the "reasonable cause" test should be abandoned. This Court believes that the test can be considered in making the determination of whether an injunction should issue. As recognized by another district court in this Circuit, "it is [also] unclear whether the Fourth Circuit has authorized district courts to apply traditional equity principles in arriving at its 'just and proper' determination." *Clark v. Fieldcrest Cannon, Inc.*, No. 4:94 cv 00308, 1994 U.S. Dist. LEXIS 20979 at *10 (M.D.N.C. Aug 25, 1994). In *United States Serv. Indus., Inc.*, the Court noted that "[t]here is no reason to depart from the traditional test for equitable relief under the "just and proper" language of Section 10(j) unless Congress had expressly, or by inescapable inference, otherwise sought to control the exercise of the court's discretion, which it has not done." 867 F.Supp. at 1084 (citing *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 320, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)) ("A major departure from the long tradition of equity practice should not be lightly implied."); *see also Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944). Therefore, the Court will apply the traditional equitable principles in making its "just and proper" determination. Further, because counsel for Petitioner asserted at the hearing that the facts of the case satisfied the traditional four-prong test as well as the two prong test, the Court believes that it will not be prejudicial against him to apply the traditional standard.

### *Reasonable Cause/Likelihood of Success on the Merits* [2]*—Violations of Section 8(a)(5)*

#### *Bad Faith Bargaining*

◼ Petitioner first alleges that Respondent is in violation of Section 8(a)(5) because it bargained in bad faith. Section 8(a)(5) provides that "[i]t shall be an unfair labor practice for an employer ... to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." 29 U.S.C. § 158(a)(5). In support of that allegation, Petitioner claims that although the Union was cooperative during the negotiations, as evidenced by the fact that it modified its wage proposals downward, Respondent was not. Petitioner claims that "Respondent consistently took the position that it would not agree to contract terms that would effectively increase its costs, and in particular, submitted proposals on wages that would have resulted in pay cuts or pay freezes for a substantial number of Unit employees." Petitioner's Memorandum at 8. Further, Petitioner claims that Respondent designated employees as temporary in an attempt to exclude them from the unit.

The main thrust of Petitioner's argument, however, is the theory that the Court, through the examination of the Respondent's conduct during the course of bargaining and after its withdrawal of recognition from the Union, will discover that Respondent bargained in bad faith. Petitioner states that "[a]fter Respondent unlawfully withdrew recognition from the Union, respondent unilaterally implemented terms and conditions of employment that were more favorable than anything it ever offered the Union at the bargaining table, thus revealing that its overall bargaining position throughout negotiations was a sham." Petitioner's Memorandum at 8 (citing Record at 822–23; Petitioner's Memorandum Exhibit 22). Petitioner relies on *S–B Mfg. Co. v. Local 659, Allied Indus. Workers of America*, 270 NLRB 485, 496 (1984) for the proposition that this constitutes a violation of Section 8(a)(5). *See also NLRB v. Katz*, 369 U.S. 736, 743 n. 11, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) (citing *NLRB v. Crompton–Highland Mills, Inc.*, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320 (1949)) ("*Crompton–Highland Mills* sustained the Board's conclusion that the employer's unilateral grant of a wage increase substantially greater than any it had offered to the union during negotiations which had ended in impasse clearly mani-

---

2. Because the reasonable cause test is a more lenient standard than the likelihood of success test, the Court will not address it separately. Instead, it will be subsumed by the likelihood of success analysis. The import of this decision is that the third factor will be discussed before the first two factors are balanced. The Court does not believe that this shift in order will effect the analysis in any way.

fested bad faith and violated the employer's duty to bargain.")

Although Respondent argues that Petitioner has not demonstrated that it bargained in bad faith, an examination of Respondent's conduct reveals that Petitioner is likely to succeed on this claim. Respondent contends that the fact that it submitted elevens proposal while the Union only submitted four shows that it was bargaining in good faith. *See* Respondent's Brief at 4–5. Respondent claims that the parties had agreed on many issues, but came to an impasse on three points: wages, random drug testing, and a no-strike clause. The Union points out that there were eighteen open issues when the parties submitted their second set of final offers in May, 1997, not three. Respondent also argues that the parties agreed to keep certain employees classified as temporary during negotiations, a fact that the Union hotly contests.

What Respondent does not address, however, is the fact that throughout the negotiations it maintained that in order to increase the wages of some of its employees, it would have to either reduce the pay of or release other employees. Further, although Respondent had annually given increases in wages before the Union was certified, after the Union was certified, it did not give them. When Respondent's employees asked about these increases, Respondent posted a notice which stated:

> Several employees have asked about the status of their annual salary increases this year. The Company is unable to grant salary increases to employees who work in a job in the bargaining unit covered by the union election that occurred on May 17. Under the law, all changes in salary must be negotiated now that the National Labor Relations Board (NLRB) has certified the union as the collective bargaining representative of the employees in the bargaining unit covered by the election.

Petitioner's Memorandum Exhibit 21.

The Union told Respondent that it would not file unfair labor charges if the annual increases were given. Respondent did not act on that invitation.

Two weeks after it withdrew recognition from the Union, however, Respondent began implementing many improvements for its employees, including a $.50 per hour pay increase, the reduction in the amount employees had to pay in terms of health insurance premiums, vacation benefits, and the conversion of the temporary employees to permanent status. All of these terms had been subject to the negotiations between the Union and Respondent. In fact, Respondent gave its employees more than it had ever offered to the Union. This is shown in the testimony of David Major ("Major"), Townsend Culinary's Vice President of Human Resources.

> Judge Kocol: ... Do I also understand your testimony that effective December—do I understand you correctly that effective December 1st, 1997, after you had withdrawn recognition from the Union, you implemented certain terms and conditions of employment for the employees that were more generous than what you had offered the Union at the bargaining table in certain respects?
>
> The Witness: In certain respects, I am not certain of that from the papers Mr. Stefan gave me it appears that way.
>
> Judge Kocol: All right. Do you have an explanation as to why you implemented those conditions for you employees that you were unwilling to make on the offer to the Union?
>
> The Witness: No, I have no explanation. I know that—I know that Mr. Willoughby and I also talked about, you know, what was the—what was the proper—the proper wage.
>
> I also talked with—as I mentioned before, talked with—talked with Mr. Swain, our President, about what we thought was the appropriate, you know, wage that we are going to be giving to employees.
>
> Why—why that was different than what our last proposal was to the Union, I do not know.

Record 822–23.

Not only did Respondent implement these improvements, it did so without reducing the pay of any employee and without firing any employee. The fact that Major could not

explain why Respondent could make these changes, when its position during bargaining was that it could not, points to a bad faith posture on Respondent's behalf.

Moreover, just as Respondent told its employees that the delays in receiving their annual increases should be blamed on the negotiation process, even though it knew it could give those benefits without facing charges, after the withdrawal, Respondent informed its employees that it was able to implement the new benefits because the Union was no longer involved. Major gave a speech on December 2, 1997, less than two weeks after the withdrawal, in which he stated:

> I want to say something up front. This is not, and I repeat not, an us against them sort of meeting. We are all Townsend employees. this is not Townsend against the Union. We have positive news and that's what I want we want to share with you this morning....
>
> The reason I'm here this morning, the reason we're all her [sic] this morning, is because you asked us, asked us to hold this meeting. You asked us to be here because about two weeks ago you circulated a petition asking us to decertify the Union. A majority of you signed that petition—gave it to us. So, therefore, about a week and a half ago, we withdrew recognition from the Union. That was done about a week and a half ago. We have withdrawn recognition. And, as of that time that you signed the petition and we sent the letter, we no longer recognize the Union as being your bargaining agent, and they no longer represented you....
>
> The reason that you didn't get the twenty five cents after your so called probationary period is because we were I the midst of negotiations with the Union and we were not able to give those increases. We were, while you are in negotiations, we cannot give any increases....
>
> We agree that you earned this, and now we are giving it to you. We would have liked to have given it to you before. But the, now that you've come to us and told us that you didn't want the Union to represent you anymore, now that we've withdrawn recognition form [sic] the union, we're able to do this for you. Townsend culinary [sic] has wanted to do this for you for a long time. Petitioner's Memorandum Exhibit 22.

If Judge Kocol believes that Major was speaking truthfully in his speech to Respondent's employees, then he could find that the position maintained during negotiations by Respondent that it could not increase wages, lower costs for health premiums and other such improvements because they were cost prohibited was indeed a sham. Therefore, Petitioner has reasonable cause to believe that Respondent bargained in bad faith. This Court "is not called on to resolve factual disputes because they will ultimately be resolved by the Administrative Law Judge who is charged with ruling on the underlying cases. Rather, the Court must determine whether the evidence presented ... demonstrates a substantial likelihood of success." *United States Serv. Indus., Inc.*, 867 F.Supp. at 1088. Due to Respondent's conduct before and after the withdrawal, the Court believes that Petitioner is likely to succeed on the merits of this claim.[3]

### Withdrawal of Recognition

■ Petitioner also alleges that Respondent violated Section 8(a)(5) by withdrawing recognition from the Union. Although Petitioner notes that Respondent withdrew recognition based·on a petition containing less than a majority of employees[4], Petitioner

---

**3.** If Major's statements are not believed to be truthful, they at least indicate that Respondent was trying to send the message to its employees that "[w]ith the Union, you get nothing. Without the Union, you get everything· the company is unwilling to provide the Union *and more.*" (Amicus Curiae Brief at 3) (emphasis in original). That this message was received by the employees is demonstrated by the testimony of Maria Augustin, one of the circulators of the decertification petition. She testified that the reason she

circulated the petition was because "[t]here were no raises, there were not types of benefits to speak of, as a result of Local 400." (Record 2073).

**4.** It cannot be disputed that less than a majority of Respondent's employees signed the petition. At the hearing, Respondent admitted that the petition contained 129 or 130 signatures, some of which had to be excluded because the people were not in the unit. This prompted Judge Ko-

claims that there were numerous other things wrong with the decertification petition.

Respondent argues that the Court should not issue the injunction because Petitioner has not provided the Court with a standard for determining whether Respondent was legally obligated not to withdraw recognition from the Union. Respondent points out the law is in flux at this moment because of a recent case by the United States Supreme Court. *See Allentown Mack Sales & Serv., Inc. v. NLRB,* — U.S. —, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998). In that case, the Supreme Court held that Board had incorrectly applied its "good faith reasonable doubt test." *See id.* As a result, the Board has begun the process of reevaluating the standard. *Chelsea Indus., Inc.,* Case Nos. 7–CA–36846 and 37016. Because of what it sees as uncertainty in the law, Respondent asserts that the injunction should not be granted because to do so would violate its due process rights.

Further, Respondent argues that Petitioner has failed to show that Respondent's alleged unfair labor practices caused either the loss of majority support for the Union, or the circulation of the decertification petition. Respondent claims that Petitioner is asking the Court to rely on mere speculation that unfair labor practices have occurred because there has not been a clear finding of such actions as of yet. Respondent claims that the withdrawal of recognition from the Union was proper, because it had a good faith doubt that its employees no longer wanted the Union's representation due to the large number of employees who signed the petition, the fact that there had been an extreme turnover since the Union election (Record at 689), the fact that employees discarded the Union literature (Record at 2131, 2596), and there had been a decertification petition the summer before the withdrawal.

At the hearing, counsel for Petitioner contended that, in seeking this injunction, he is not challenging the decertification petition under the good faith doubt standard. Petitioner stated that although numerous different theories have been advanced before Judge Kocol, in this Court, the theory that the petition arose during the time of bad faith bargaining, and thus is invalid, is being argued. In other words, Petitioner's theory is that Respondent is not privileged to rely on the decertification petition because it was tainted by its unremedied unfair labor practices.

■ To make this argument, Petitioner relies on *Lee Lumber & Building Material Corp.,* 322 NLRB 175, 1996 WL 523011 (N.L.R.B. September 6, 1996). In that case, the Board explained that for a year after its certification "a union is irrebuttably presumed to continue to enjoy the support of a majority of the unit employees for 1 year after its certification (absent unusual circumstances) and, after the certification year has elapsed, while a collective-bargaining agreement is in effect." *Id.* 1996 WL 523011 at *3 (citing *Brooks v. NLRB,* 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954)); *Belcon, Inc.,* 257 NLRB 1341, 1346–47 (1981). Although the union enjoys this presumption after the contract expires, the presumption is then rebuttable. *Id.* Currently, an employer may withdraw recognition "if it can show either that the union in fact no longer has the support of a majority of the unit employees, or that the employer has a reasonably based doubt, based on objective considerations, as to the union's continued majority status." *Id.* As previously explained the good faith doubt standard is currently being reevaluated at the time of this Opinion. An employer relying on good faith doubt, as Respondent does here, must do so "in a context free of unfair labor practices of the sort likely, under all the circumstances, to affect the union's status, cause employee disaffection, or improperly affect the bargaining relationship itself." *Id.*

■ As the Board in *Lee Lumber* explained, all unfair labor practices are not created equal. *See id.* Instead, violations other than the refusal to recognize and bargain require "specific proof of a causal relationship between the unfair labor practice

---

col to ask, "So for my understanding, how did you conclude that 129 or 130 was a majority of 311? What am I not understanding?" Record at 2589.

and the ensuing events indicating a loss of support. In cases involving an 8(a)(5) refusal to recognize and bargain with an incumbent union, however, the causal relationship between unlawful act and subsequent loss of majority support may be presumed." *Id.*

As the Board explained, this presumption serves the general purposes of the NLRA, which is encouraging collective bargaining. *See* 29 U.S.C. § 151. The Board stated:

> The two presumptions—that majority support continues and that a refusal to recognize and bargain taints a subsequent expression of employee disaffection—foster stability in at least two ways. They enable a union to concentrate on negotiating an acceptable agreement without worrying that it will lose majority support unless it produces immediate results; they also remove from the employer the temptation to avoid its bargaining duties in the hope that delay will undermine employees' support for the union.

*Lee Lumber,* 322 NLRB 175, 1996 WL 523011, at *6.

Petitioner relies on this presumption to argue that Respondent's withdrawal of recognition from the Union is tainted by the bad faith bargaining, and thus unlawful as well. The presumption is supported by the fact that the Respondent did not give its employees their annual increases, even though the Union told Respondent that it would not seek unfair labor practices charges if the increases were given. Further, Respondent posted a statement that blamed the delay on the negotiations. After the withdrawal, Respondent granted those benefits and more. Moreover, Respondent informed its employees that "now that we've withdraw recognition ... we're able to for this for you." As it is likely Judge Kocol will find that Respondent's overall conduct reflects that it was bargaining in bad faith, it is also likely that he will find that the presumption applies in this case. Therefore, Petitioner has reasonable cause to believe that the withdrawal of recognition was unlawful, and is likely to succeed on the merits of this claim.

### Threat of Irreparable Harm

■ Petitioner has articulated facts showing that the Union would suffer irreparable harm in the absence of injunctive relief. Petitioner has produced evidence that Respondent has blamed the Union for the delays its employees suffered in receiving their benefits and has informed its employees that it is now able to give additional benefits because the Union is no longer involved. The message, as the Union articulates it, "With the Union, you get nothing. Without the Union, you get everything the company is unwilling to provide the Union *and more,*" Amicus Curiae Brief at 3 (emphasis in original), has clearly been given to the employees. This message has been received, as shown by the decline in support for the Union from a 2 to 1 margin in May, 1996, to a little more than fifty percent in November, 1997.

The Court's major concern is preserving the status quo as it existed before Respondent's alleged bad faith bargaining and unlawful withdrawal of recognition. If an injunction is not issued now, the Union may suffer a permanent type of harm in the time that it will take for a final resolution by the Board. Support for the Union may dissipate to such a level that the Union could never recover, even if the Board ultimately reinstates it as the unit's bargaining agent. Thus, any chance for "a meaningful opportunity for collective bargaining [after the Board's resolution might be] destroyed," if the Court fails to act now. *Overstreet v. Thomas Davis Medical Centers, P.C.,* 9 F.Supp.2d 1162, 1167 (D.Ariz.1997).

■ The harm claimed by Respondent is not a palpable harm. Respondent claims that it will be harmed by an interim order in that it would be required to bargain with Union before it is determined whether it is legally required to do so. Further, Respondent argues that an injunction would violate the rights of its employees that do not want Union representation, and would create the inference that Respondent had bargained in bad faith.

As stated by another district court facing similar arguments:

> The Court finds that in weighing the balance of hardships the Union will lose more should an injunction not be granted than the Respondent will lose if an injunction be

granted.... The imposition of a bargaining order is not unduly burdensome on Respondent because it is not permanent, and any agreement between the parties can contain a condition subsequent to take into account the possibility of the Board or the court of appeals rejecting the Regional Director's decision. Additionally, the bargaining order requires only that Respondent meet with the Union and bargain in good faith, it does not compel Respondent to agree to any particular terms or conditions of employment.

*Id.*

Although Respondent has made many arguments why the injunction should not issue, the one with the most merit is its claim that Petitioner has waited too long to seek this relief. Respondent points out that the last bargaining session between Respondent and Union occurred in October 1997, almost a year ago. Respondent also notes that the complaint upon which the underlying case is based was filed in April, 1998. Section 10(j) gives the Board the power "upon issuance of a complaint" to seek injunction relief. As Petitioner did not seek until injunctive relief until after the hearing before Judge Kocol, Respondent argues that there has been a "tacit admission" by Petitioner that there is not an urgent need for injunctive relief.

At the hearing, Petitioner blamed the delay on bureaucratic difficulties. Petitioner claimed that there were so many possible violations of the NLRA alleged, that by time the allegations had been fully investigated, the hearing before Judge Kocol was imminent. Therefore, Petitioner made the decision to postpone petitioning for injunctive relief until after the hearing and after an administrative record had been developed. Petitioner stated that, in hindsight, the petition should have been filed earlier.

■ The fact that Petitioner waited until after the administrative hearing does not bar the Court from issuing an injunction. "Delay by itself is not a determinative factor in whether the grant of interim relief is just and proper. Delay is only significant if the harm has occurred and the parties cannot be returned to the status quo or if the Board's final order is likely to be as effective as an order for interim relief." *Aguayo v. Tomco Carburetor Co.,* 853 F.2d 744, 750 (9th Cir. 1988), overruled on other grounds by *Miller v. California Pacific Med. Ctr.,* 19 F.3d 449. The real issue for the Court, therefore, is whether it should intervene now, or await the decision by Judge Kocol before granting the injunctive relief. Because the Court believes that the Union is in particularly vulnerable position that can only get worse with the passage of time, injunctive relief is appropriate now.

Furthermore, the Court believes that Respondent's continuing actions warrant the issuance of injunctive relief. Petitioner has informed the Court that a new complaint alleging unfair labor practices by Respondent was filed a week before the hearing before this Court. Respondent claims that the new complaint is derivative in nature, stemming from allegations in the pending case. What the Court finds most troubling, however is a memorandum Respondent wrote for its employees. This memorandum, entitled "To All Employees" was posted in the Respondent's plant after the close of the hearing before Judge Kocol. In this memorandum, Respondent detailed the improvements in benefits that it had given to its employees. Respondent, however, did not merely state those facts. Instead it included the following statements:

Many of you asked us to decertify the Union about seven (7) months ago. We sent a letter to the Union withdrawing recognition. Through the unfair labor practice charges and by misinforming you, they are trying to return here again. We know that you do not want a union representative and we respect your right not to have them here. We believe that you do not have to pay dues to the Union to get good benefits and salaries....

*In the last two years, the Union has not:*

• Done anything for you! Except bother you and lie to you continuously ...

• If you see Leonardo near the plant, you should know that he is a paid union representative and that he has been present in the legal trial. All that he has been doing is misinforming you about

what is happening in the legal proceeding. If he tries to tell you about the testimony of any of the witnesses, he is violating the law.

Petitioner's Reply Exhibit 1

The Court finds that this announcement to be an unnecessary display of anti-Union animus. Without an order reinstating the Union right now, Respondent will be able to make such statements with impunity. The comments found in the memorandum cannot help but to further the process of reducing the support for the Union. The fact that support for the Union has already declined to a little more than fifty percent, coupled with the fact that Respondent is releasing such statements, establish that injunctive relief is appropriate at this time. The balance of the harms is in Petitioner's favor.

### Public Interest

■■■ The public interest clearly favors enjoining Respondent from further violating Section 8(a)(5) by refusing to bargain in good faith with the Union. "[T]he passage of the statute is itself an implied finding by Congress that violations will harm the public. . . . [T]he public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Miller v. California Pacific Med. Ctr.,* 19 F.3d at 459, 460. An order requiring Respondent to reinstate the Union at the plant and to bargain with the Union will further one of the purposes of the statute, encouraging collective bargaining. Moreover, "[t]he public interest in a case involving alleged unfair labor practices under the Act lies in ensuring that the purposes of the statute are furthered and that the processes of the Board, and any ultimate remedies it imposes, are effective." *United States Service Industries, Inc.,* 867 F.Supp. at 1086. Without such an order in this case, the Union may not be able to recover any of the support it has lost because of Respondent's action due to the time it could take for the Board to ultimately reinstate it. "Where the Board's remedial powers would be ineffective without a court order temporarily returning the protagonists to the positions they occupied before occurrence of the alleged unfair labor practice, the district court normally has discretion to issue such an order." *Schaub v. Detroit Newspaper Agency,* 154 F.3d 276, 279 (6th Cir.1998.)

The Court will use this discretion to not only enjoin Respondent from withdrawing recognition from the Union and order the Respondent to bargain with the Union in good faith, but also to enjoin Respondent from posting or distributing documents containing disparaging remarks, like those found in the notice posted after the hearing before Judge Kocol, about the Union. Further, in a effort to counteract effect of the recent postings containing disparaging remarks about the Union, and to explain to Respondent's why the Union must be reinstated, the Court will order Respondent to post copies of this Opinion and the order to follow at its Laurel, Maryland facility. Because the majority of Respondent's employees speak Spanish, the copies must be in English and Spanish.

### Reinstatement of Palacios

■■ Petitioner also seeks an order reinstating Leonardo Palacios. Petitioner claims that Palacios, a Union shop steward, was terminated by the Respondent because of anti-Union animus, and because he violated an overly broad solicitation and distribution policy. Petitioner alleges that this action is in violation of Section 8(a)(1) and (3) of the NLRA which provide that it "shall be an unfair labor practice for an employer . . . (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title. . . . (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(1), (3).

■■ In order to determine whether an employer has violated Section 8(a)(3), the Court must look at the employer's motivations behind the discharge.

[I]t is undisputed that if the employer fires an employee for having engaged in union activities and has no other basis for the discharge, or if the reasons that he proffers are pretextual, the employer commits an unfair labor practice. He does not violate the NLRA, however, if any anti-union

animus that he might have entertained did not contribute at all to an otherwise lawful discharge for good cause.

*NLRB v. Transportation Management Corp.*, 462 U.S. 393, 398, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), overruled in part on other grounds by *Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 276–78, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994).

Palacios was terminated on April 21, 1998, after a series of events which began on March 11, 1998. On that day, Palacios was passing out Union literature by the time clock in the plant. While he was engaged in this activity, Carlos Holgado, Townsend Culinary's Director of Human Resources, approached Palacios and told him to stop. Holgado told Palacios that he was in a work area, and therefore could not distribute literature without violating the company's no solicitation, no distribution policy. At the time, the policy as provided by tile company's employee handbook, provided in pertinent part, "Soliciting by one employee of another, or collecting from one employee by another, is prohibited while either employee is on work time. Distributing literature and circulating petitions during work time or in work areas at any time is also prohibited." Petitioner's Memorandum Exhibit 23 at 13. Palacios received a written warning, mentioning an earlier alleged violation of the policy, which Holgado admitted he did not witness, and informing Palacios that another violation could result in his termination.

On March 13, 1998, Respondent posted a "clarification" of the no solicitation, no distribution policy, which was promulgated by Holgado, allegedly in response to Palacios confusion over what the original policy entailed. This clarification narrowed the scope of the original; according to the clarification, employees could no longer distribute literature during all break times in all non-work areas. Instead, the clarification stated that "[e]ffective immediately all distribution of literature will take place in the cafeteria during the employee's lunchtime that does the distribution. No employee is to distribute any type of literature—**except for company-related information**—(newsletter, brochures, etc.) in any other place in the plant." Petitioner's Memorandum Exhibit 26 (emphasis in original).

On April 20, 1998, Palacios was distributing a flyer which contained a picture of him with Senator Edward Kennedy, and discussed Palacios's testimony before a congressional committee. Palacios claims that after he distributed the flyer to the people inside the cafeteria, he began passing it out at the entrance of the cafeteria. Holgado, on the other hand, claims Palacios was outside of the cafeteria, in the hallway, by door. When Holgado asked to Palacios to move further into the cafeteria, Palacios refused. The next day, Palacios was discharged.

Petitioner claims that Palacios was fired because he was the "communications link and symbol of the Union." Petitioner is not asking the Court to make Palacios whole through back pay and other such remedies, but only to reinstate him. An interim order to reinstate Palacios, Petitioner claims, would erase the message Respondent sent to its employees that supporting the Union would lead to their terminations, and would restore to the employees their "most effective advocate." Petitioner's Memorandum at 40.

Respondent argues that the Court should not reinstate Palacios because he was terminated for insubordination, not merely for violating the no solicitation and no distribution policy. Respondent claims that Palacios was fired because he would not follow the directive to go back into the cafeteria given by Holgado. Further, Respondent claims that Palacios provoked his dismissal. Respondent argues that Palacios knew what the policy was, and deliberately violated it. Respondent points out that the clarification was in existence for a month before Palacios's termination, and the Union did not file a unfair labor practice charge claiming the policy was over broad until after he was fired. Respondent claims Palacios was a "seasoned union advocate," who was "aware that the proper way to challenge the breadth of company solicitation and distribution policy, if that was an issue, was to file a charge with the National Labor Relations Board as the Union had frequently done in the past." Respondent's Brief at 33–34.

Respondent claims that Palacios had a history of discipline problems, including a suspension for threatening, Maria Augustin, while she was circulating the decertification petition. Respondent argues that the fact that there are three or four shop stewards left at the plant demonstrates that it does not discriminate against employees who support the Union. Finally, Respondent claims that Palacios should be equitably barred from being reinstated because it found out at the hearing before Judge Kocol that Palacios had violated company policy and Maryland law by taping David Major's speech without his consent. Therefore, Respondent argues that reinstating Palacios would be a futile gesture, because the company would fire him again, utilizing the after acquired evidence rule. See McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). Petitioner argues, however, that Palacios did not break the law because he recorded a speech made to the entire workforce, instead of a private conversation. Further, Petitioner contends that Respondent knows that this activity does not violate the law because it objected to the introduction of the recording into evidence at the hearing, and was given time to prepare an argument in support of the objection, but abandoned it. Judge Kocol admitted the tape and the transcript of the speech.

The allegations regarding Palacios's termination contain hotly contested issues of fact. The Court does not have to decide these issues, nor does the Court have to make a determination of whether the Petitioner is likely to be successful on the merits of these claims, because Petitioner has failed to establish the irreparable harm required for injunctive relief. Petitioner conceded at the hearing that Palacios himself would not suffer any irreparable harm, because he is currently employed by the Union. Instead, Petitioner argued that Respondent's employees would suffer irrepable harm because Palacios was "the voice of plant." Petitioner claims that no one else will stand up to support the Union, if Palacios is not reinstated. The Court has not been persuaded that another employee cannot take on the role that Palacios served in the plant. The Court order requiring Respondent to bargain with the Union should be an effective enough measure for the time being. Judge Kocol can more rightly provide whatever remedies are due to Palacios in this situation. In order for this Court to reinstate Palacios under equitable principles, Petitioner must show that the harm that will be suffered by the current employees is "neither remote, nor speculative, but actual and imminent." Manning, 119 F.3d at 263. This, Petitioner has failed to do.

### No Solicitation, No Distribution Rule

Finally, Petitioner asks the Court to enjoin Respondent from maintaining or enforcing the clarified no solicitation, no distribution rule, which Petitioner claims is overly broad. Petitioner alleges that this policy also violates section 8(a)(1).

Petitioner argues that without an injunction "the Unit employees will be deprived of their right to lawfully distribute Union literature throughout the duration of the Board litigation—a loss that a Board order in due course cannot retroactively remedy." Petitioner's Memorandum at 42. Respondent argues that Petitioner is asking for an advisory opinion from this court because no other employee besides Palacios has been disciplined for violating the clarification.

Although petitioner may succeed on the merits of this claim because the policy "can be interpreted to restrict solicitation and distribution ... during breaks and between shifts," MBI Acquisition Corp. 324 NLRB No. 188 (November 8, 1997), the Court believes that Petitioner has not demonstrated the necessary irreparable harm. Petitioner argues that under the policy employees may not distribute Union literature in bathrooms and locker rooms, or during other break times besides lunchtime. However, Petitioner has not shown any enforcement of the policy in those areas. If Judge Kocol finds this policy to be overly broad, he can enjoin Respondent from maintaining it. Petitioner has not given the Court a compelling reason to do so now.