**Curtis A. WELLS, on Behalf of the NATIONAL LABOR RELATIONS BOARD, Plaintiff,**

v.

**BROWN & ROOT, INC., Defendant.**

**No. Civ.A. 99–0635–CB–M.**

United States District Court,
S.D. Alabama,
Southern Division.

Aug. 4, 1999.

---

Lesley A. Troope, Andrea J. Goetze, Michael B. Frost, National Labor Relations Board, New Orleans, LA, J. Cecil Gardner, Kimberly J. Calametti, Gardner, Middlebrooks, Fleming, Gibbons & Kittrell, P.C., Mobile, AL, for Plaintiff.

Thomas J. McGoey II, Kullman, Inman, Bee, Downing & Banta, Howard S. Linzy, The Kullman Firm, PC, New Orleans, LA, for Defendant.

## MEMORANDUM OPINION and ORDER

BUTLER, Chief Judge.

This matter is before the Court on Petition for Injunction filed by the Regional Director of the National Labor Relations Board ("Board") pursuant to section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j) (Doc. 1). In determining whether a 10(j) injunction should issue, the Court of Appeals for the Eleventh Circuit has determined that this Court should undertake a two-step analysis. First, the Court should determine whether the Board had reasonable cause to believe that Brown & Root committed labor violations.[1] Second, the Court must address whether an injunction is just and proper. *Arlook v. S. Lichtenberg & Co., Inc.*, 952 F.2d 367, 371 (11th Cir.1992) (citations omitted).[2] The former Fifth Circuit adopted this analytical framework in *Boire v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America,* 479 F.2d 778 (5th Cir.1973) and *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185 (5th Cir.1975), when the issue of the standard for a Section 10(j) injunction was virtual *tabula rasa* in the Circuit.[3]

Following the Eleventh Circuit's format, and based upon the administrative record, the Court determined that the Board had met the nearly featherweight burden of showing reasonable cause to believe that Brown & Root had committed violations of the NLRA. Thereafter, the Court held a hearing on the issue of whether injunctive relief pursuant to section 10(j) was just and proper or equitably necessary. At the conclusion of the Board's case, Brown & Root made a motion for judgment as a matter of law.[4] The Court ordered the parties to submit briefs regarding the motion, and, having considered the briefs, the

---

1. It is worthy of note that there is a significant division among the Circuits as to whether district courts should apply the reasonable cause/just and proper analysis at all. As recently as April of 1999, the Court of Appeals for the Eighth Circuit, with the Hon. W. Brevard Hand of the Southern District of Alabama sitting by designation, affirmed a district court's decision that traditional equitable concepts governed Section 10(j) proceedings rather than the reasonable cause/just and proper analysis. *Sharp v. Parents in Community Action, Inc.*, 172 F.3d 1034 (8th Cir. 1999). Additionally, the Court of Appeals for the Ninth Circuit, sitting *en banc,* has likewise departed from the reasonable cause/just and proper standard. *Miller v. California Pacific Medical Center*, 19 F.3d 449 (9th Cir.1994). Both cases cite with approval Judge Easterbrook's opinion for the Seventh Circuit in *Kinney v. Pioneer Press*, 881 F.2d 485 (7th Cir.1989). Judge Easterbrook's opinion in *Kinney v. Pioneer Press* affords a thorough discussion of the derivation of the reasonable cause/just and proper standard and an explanation of how the bifurcated analysis has crept into the jurisprudence under Section 10(j). *Kinney v. Pioneer Press*, 881 F.2d at 488–490. In essence, the Seventh Circuit held that the reasonable cause analysis applied only where an action was brought under Section 10(*l*)—a section which mandates Board action. Conversely, because Section 10(j) actions are purely voluntary, the reasonable cause analysis was simply inapplicable.

2. The Court notes with particular interest that, notwithstanding the parties' reliance on *Arlook v. S. Lichtenberg*, the Eleventh Circuit's holding in that case was specifically limited— that the district court erred in concluding that the Board did not have reasonable cause to believe that the Defendant violated the NLRA and that it was an abuse of discretion, on the facts presented, for the court to deny all injunctive relief. *Arlook v. S. Lichtenberg*, 952 F.2d at 374.

3. The Fifth Circuit referred to the "just and proper" prong as "equitable necessity." That Court ruled that, while "traditional rules of equity may not *control* the proper scope of § 10(j) relief, some measure of equitable principles come into play." *Boire v. Pilot Freight Carriers*, 515 F.2d at 1193 (emphasis added).

4. Brown & Root, though not specifying under precisely which rule it moved, has indicated in its Brief (Doc. 21) that it requests a judgment on partial findings as provided in F.R.Civ.P. 52(c).

Because this Court finds the rationales presented in cases before other circuits to be both well-reasoned and compelling, the Court encourages the Eleventh Circuit to provide some guidance to the district courts regarding the appropriate analytical framework for Section 10(j) actions should this ruling be appealed.

Court finds that Brown & Root's motion is due to be granted.

### The Standard for Judgment on Partial Findings.

Federal Rule of Civil Procedure 52(c) provides:

> If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

F.R.Civ.P. 52(c). Rule 52(c) applies in cases where the court acts as both judge and jury, either in non-jury cases or where there is an advisory jury, and, as such, the Court may resolve conflicts in the evidence as well as make credibility assessments. *Stearns v. Beckman Instruments, Inc.*, 737 F.2d 1565, 1568 (Fed.Cir.1984). Additionally, the Court should evaluate the evidence without making any special inferences in favor of the non-moving party and should resolve the case on the basis of a preponderance of the evidence. *Emerson Elec. Co. v. Farmer*, 427 F.2d 1082, 1086 (5th Cir.1970).

### Findings of Fact.

**Background**

In April, 1998, CIBA Specialty Chemicals Corporation solicited bids for the material handling operations at its McIntosh, Alabama, plant. Brown–Eagle Contractors, Inc. had been under contract to perform this work for a number of years. After some safety concerns arose regarding Brown–Eagle, CIBA informed the company that its services would no longer be required after June 10, 1998. Brown–Eagle was a union shop and had an collective bargaining agreement with the United Food and Commercial Workers Union, Lo-

cal 1657 ("Union"), which was to extend through January 31, 2000. The Union had been the exclusive collective bargaining agent for the Brown–Eagle material handling workers for approximately six years.

Brown & Root, a corporation completely unrelated to Brown–Eagle, had a 40–year presence at CIBA's McIntosh facility and submitted a bid for the material handling work on May 5, 1998. As part of the bid, Brown & Root stated that it was an open, or non-union, shop, but anticipated no difficulty in working with in conjunction with the unionized workers at the facility. Brown & Root projected that the transition from Brown–Eagle would be relatively seamless, with full integration to be complete within five weeks. In order to ensure that the transition went smoothly, Brown & Root indicated that it anticipated re-hiring a significant number of Brown–Eagle's workers. On May 22, 1998, CIBA awarded the material handling contract to Brown & Root.

Brown & Root conducted a series of meetings with the Brown–Eagle workers to explain the transition process. All 68 Brown–Eagle employees were invited to apply for positions with Brown & Root and the employees were told that they would receive a preference over equally-qualified outside applicants when hiring decisions were made. Still and all, the Brown–Eagle workers, like all other applicants, would be required to pass a test, go through an interview process, and be offered employment formally. Should the Brown–Eagle workers receive a job offer, they would begin as new employees—they would have no seniority on the basis of their Brown–Eagle employment. The Brown & Root officials informed the workers that the terms and conditions of employment, as established under the collective bargaining agreement between the Union and Brown–Eagle, would no longer be in effect and that, should the workers continue under Brown & Root, it would be on Brown & Root's terms. It is worthy of note that Brown & Root, while eliminating some benefits, offered considerably higher rates

of pay than was the case under Brown–Eagle.[5] Brown & Root posted notice of the anticipated job openings, placed advertisements in the *Mobile Press–Register*, and informed the State of Alabama Job Service in order to solicit applications.

During this series of meetings in late-May and early-June, 1998, Brown & Root managers provided answers to questions posed by the workers that appear somewhat anti-Union. Bill Outlaw, Brown & Root's Construction Project Manager, informed the Brown–Eagle workers that Brown & Root was an open shop. He apparently expressed an opinion that Brown & Root simply would not accept union representation in the material handling operation.

In early June, 1998, while Brown & Root was accepting applications, but prior to Brown & Root's official takeover of the material handling operation, Union officials approached Outlaw and requested that Brown & Root recognize the Union. Outlaw demurred, emphasizing that the Union did not purport to represent a majority of the workers Brown & Root had hired, nor did the Union have an expression of interest on behalf of the requisite 30% of Brown & Root's workers. Brown & Root continued to process applications—64 former Brown–Eagle workers applied, approximately 110 others did likewise.

By June 10, 1998, when it formally assumed control of the material handling operation, Brown & Root had completed its initial hiring. Of the 77 workers hired, 18 were former Brown–Eagle employees. Brown & Root also hired 11 former Brown–Eagle supervisors for like positions in the new operation. On June 22, 1998, the Union withdrew its petition for recognition and on June 24, 1998, filed a charge of unfair labor practices with the Board. The Union filed a second unfair labor practices charge, nearly identical to the first, on August 31, 1998 and on September 2 withdrew the June 24 charge. The Union amended its August 31 charge on November 24 and December 30, 1998. On December 31, 1998, the Board issued its Complaint and Notice of Hearing regarding the Union's charge.

Not until April 9, 1999, nearly one year subsequent to the alleged anti-union activities, did the Regional Director file the instant action requesting that this Court enjoin Brown & Root from engaging in unfair labor practices, to reinstate all former Brown–Eagle employees, and to recognize the Union as the employees' collective bargaining agent. By that time, the Administrative Law Judge had conducted a hearing on the Union's Complaint and had taken the matter under submission. Still, the case proceeded at an unusually leisurely pace. The Court ordered the parties to brief the reasonable cause aspect of the 10(j) proceeding and to submit proposed findings of fact citing to the administrative record by May 28, 1999. The parties, due to other matters pending before other courts, requested an extension of time to June 14, 1999. On June 23, 1999, this Court rendered its finding that the Board had satisfied the reasonable cause prong and ordered that the parties appear for a hearing to determine whether an injunction was just and proper.

### The Just & Proper Hearing

On June 30, 1999 the parties appeared before this Court for a hearing on whether an injunction pursuant to Section 10(j) of the National Labor Relations Act was just and proper or equitably necessary. The parties were allowed to call such witnesses as each deemed appropriate. The Regional Director had also submitted twenty-five affidavits in support of his petition for injunctive relief (Doc. 1).[6] The Court, hav-

---

**5.** The Administrative Law Judge found specifically that Brown & Root's altering the terms and conditions of employment was not a violation of the Fair Labor Standards Act and, therefore, the Regional Director will not succeed on the merits as to his claim that, by so changing the terms and conditions of employ-

ment, Brown & Root engaged in an unfair labor practice.

**6.** The affidavits were signed by Lamark Herring, André Love, Ernest Moss, Carl E. Thomas (sic), Patrick Thomas (sic), Kunta Reason, Derrick Mitchell, Sean Radcliff (sic), Lenny

ing heard testimony regarding the taking of these affidavits, has serious questions regarding the veracity of these affidavits as they were all written by the now-former counsel to the Regional Director and all use precisely, or near precisely, the same language. The Court finds that these affidavits to be less than credible and will give them no weight in making its decision.

**Witness Appearing on Behalf of Brown & Root**

**1. Nathaniel Jackson[7]**

Mr. Jackson had been a Brown–Eagle employee and did not receive a position following Brown & Root's take-over of the material handling operations at CIBA's McIntosh, Alabama, plant. Having heard his testimony, the Court finds that Jackson would accept reinstatement with Brown & Root if such action, even absent restoration of the terms and conditions of employment under the collective bargaining agreement, came with Union representation.

**Witnesses Appearing on Behalf of the Board**

**1. Daisy Gamble**

Ms. Gamble was a Brown–Eagle employee who obtained employment with Brown & Root. In May, 1999, she obtained employment at a location significantly closer to her residence, and, as such, she would not accept reinstatement under any circumstances. It is clear to this Court that Ms. Gamble's reasons for refusing reinstatement are purely personal and, quite simply, have absolutely nothing to do with working conditions at Brown & Root or the presence or absence of the Union.

Dean, Christopher Hill, DeMarlo Reed, John T. Simpson, Jr., Dexter A. Sims, Jimmy Beasley, William Anderson, Marcus Nettles, Tony James, Heather Williams, Joseph C. Freeman, Jeff Koen (sic), Charles Baxter, Renie Jackson-Moses, Kelvin Houston, Michael Allen, and Jamie Mason. Of these, André Love, Marcus Nettles, Tony James, Patrick Thomas, and Heather Williams appeared at the hearing. The Court will, of course, consider and evaluate the credibility of these witnesses.

In discussing her employment with Brown & Root, Ms. Gamble expressed some dissatisfaction because, although she was earning $10.90 per hour—more than $2.00 more than her Brown–Eagle pay and the top pay rate for non-supervisory employees—she was unhappy that other, lower-paid employees, had received pay raises after 90 days with Brown & Root. Ms Gamble opined that, with Union representation, she would have been happier in her job and, it appears, she believed that she would have received a 90-day pay raise.

Ms. Gamble also testified regarding Union activities at the plant following Brown & Root's takeover of the material handling operations. Brown & Root had made it clear to her and the other Brown–Eagle employees that the company was not unionized. After the takeover, the Union carried on no activities whatsoever. There were no meetings; there were no shop-steward elections; the employees made no attempt to organize or otherwise re-establish the Union; no one wore Union badges or displayed other paraphernalia. Ms. Gamble could not provide the names of any former Union officials, nor had she ever attended a Union meeting or engaged in other Union activities while she was employed by Brown–Eagle.

Gamble recounted a conversation she allegedly had with her supervisor, Carl Thomas. Purportedly, Thomas stated to her and the other workers on her shift that "Union talk is a fast way to get fired" and that Union talk was off-limits. She believed that Thomas made the statements sometime around January or February of 1999, after the employees learned that the Board had instituted the present lawsuit.[8]

7. Mr. Jackson was scheduled to appear as a witness for Respondent. However, because of personal commitments, he was unable to wait for the Board to complete its case and, therefore, the Board called him as its first witness. The Court is cognizant of the fact that the Regional Director did not call this witness and will view his testimony accordingly.

8. The Board issued a Complaint and Notice of Hearing on December 31, 1998 and filed its Petition for Injunction on April 9, 1999.

The Regional Director presented no other witness to corroborate this testimony. The instant hearing was the first time Ms. Gamble mentioned the alleged conversation. She stated that she had not reported the incident to the Regional Director's investigators or attorneys in any of her prior meetings with them; she did not testify regarding any such conversation before the Administrative Law Judge at the February trial; she did not report the statement to any Union official. The Court finds specifically that Ms. Gamble's testimony regarding these statements was not credible and will give no weight to that aspect of her testimony.

### 2. George Seidenfaden

George Seidenfaden is the president of the United Food and Commercial Workers, Local 1657 ("Union"). In 1992, Seidenfaden negotiated an eight-year collective bargaining agreement with Brown–Eagle on behalf of the Union employees. After Brown & Root took over Brown–Eagle's operations, the Union petitioned for an election. However, because the Union then represented fewer than 30% of the Brown & Root workers, the Union withdrew its petition.

Thereafter, the Union ceased virtually all activities at the McIntosh plant. There were no requests for union materials; there were no attempts at handbilling; the Union conducted no organizing efforts; no former union employee requested representation in a grievance proceeding. The Union conducted no intelligence operations to determine what employees were now working for Brown & Root. Seidenfaden indicated that no one from his office contacted either new or former employees to encourage Union activity. In essence, according to the Local's president, the Union did nothing; it did not even keep in contact with the employees it once represented and whom the Regional Director hopes will be reinstated.

Having observed Mr. Seidenfeden's testimony, it is clear to the Court that the Union is not particularly interested in maintaining a presence at CIBA's McIntosh facility. Neither the Union nor any union members has ever attempted to organize the Brown & Root employees. There has been no contact with those employees and the Union expended no effort to maintain contact with its former members until the very eve of the instant hearing. The Court finds it somewhat unbelievable that, on the one hand, an injunction is necessary to protect and preserve the collective bargaining process while on the other, unionization of the CIBA facility is not important enough for the Union to keep track of the employees it once represented.

### 3. James Cooley

Mr. Cooley is a former Brown–Eagle employee who applied for, but did not obtain, a position with Brown & Root. He has since obtained other employment and, because he clearly enjoys his present job, would not accept reinstatement with Brown & Root even were Brown & Root to offer more money and were he to be represented by the Union.

### 4. Heather Williams

Mrs. Williams did not obtain employment with Brown & Root and would not accept reinstatement because, as she states, she would be afraid of being laid off in the near-term. However, on being cross-examined, the Court finds Mrs. Williams' direct testimony to be disingenuous—in actuality she would not return to Brown & Root because she does not need to work. Her husband has a good job as an engineer and, with four step-children, it is clear that part of Mrs. Williams' reluctance to return to Brown & Root stems from the fact that she would prefer to remain at home.

### 5. Marcus Nettles

Brown & Root did not hire Mr. Nettles after taking over the Brown–Eagle operations. As recently as June 28, 1999, Mr. Nettles approached Brown & Root to apply for a material handling position. It is

clear that Nettles would accept employment with Brown & Root, without regard to the working conditions; with union representation or not; though, if given his druthers, he would prefer to be represented by the Union.

### 6. Stephanie Erving

Ms. Erving, like the other witnesses, was not offered a Brown & Root position. She was emphatic that she would not accept reinstatement. She believes that, because of her former Union affiliation, she would be fired in due course for one trumped-up reason or another. The Court, having viewed her testimony, finds that Ms. Erving has no rational basis for holding this opinion as she has never been subjected to any anti-union behavior by Brown & Root. Additionally, as was the case with Heather Williams, Erving's testimony was, to a large degree, impeached on being questioned by the Court, for, it is clear that, notwithstanding her initial adamance about the Union, in actuality she no longer needs to work because her husband has a good job and she now prefers to stay at home.

### 7. Betty Johnson

Ms. Johnson was not offered employment with Brown & Root. For the last seven months, she has been employed in a non-union job by Vanity Fair in Jackson, Alabama. She stated in her affidavit, procured by counsel for the Regional Director, that she would not accept reinstatement. However, on cross-examination, it became clear that counsel never inquired whether the witness would return to work if the Union returned also, nor did counsel inform the witness that she would receive a substantial pay raise and full back-pay.[9] Her opinion moderat-

ed considerably when informed that, were the Board to win its case, the Union would represent the Brown & Root employees, she would receive a pay raise, and she would be entitled to back-pay—under those circumstances, Ms Jackson would consider reinstatement.

### 8. Billy Sullivan

Mr. Sullivan, a former Brown–Eagle worker, was an unsuccessful Brown & Root applicant. He is currently employed by M & M Industrial Service in a non-unionized position. Initially, Mr Sullivan was clear that he would not return to work for Brown & Root under any circumstances because of his previous experience as a worker in Brown & Root's construction operations. Sullivan was dissatisfied with Brown & Root generally because he was laid off in a reduction-in-force due to lagging construction operations. However, on cross-examination it became clear that Mr. Sullivan's refusal was equivocal at best. When presented with a scenario in which he would return with Union representation, he stated that he would return to Brown & Root after all, though he believes that only "family members" remain with the company for any length of time.

### 9. Patrick Thomas

Initially, Mr. Thomas' application for employment with Brown & Root was rejected. However, in May, 1999, he obtained a position in the material handling operation. He attended training for but one and one-half days before resigning due to a dispute regarding his salary. Though he has since obtained other employment paying more than he will receive if rein-

9. On cross-examination and upon being asked by the Court, it became clear that counsel for the Regional Director asked each former Brown–Eagle employee a series of questions and that counsel wrote, in narrative form, what she believed to be their answers in her own hand. Counsel then requested that the employees sign the affidavit she, in essence, had prepared. It is again worthy of note that there is a remarkable tendency of the affiants to use nearly exactly the same language in their affidavits. As was stated above, the affidavits originally submitted are of dubious veracity, not because the affiants were being untruthful but because counsel for the Regional Director clearly engineered the affidavits and, in the doing, undermined any value those affidavits might have had.

stated by Brown & Root, Thomas clearly would return to the company—either at $10.75/hour unconditioned on Union representation, or at $9.50/hour conditioned Union representation.

**10. André Love**

Mr. Love is currently unemployed and, as recently as June, 1999, attempted to apply for a position with Brown & Root's material handling unit. He was unequivocal that he would accept a job offer from Brown & Root with or without Union representation. He would prefer to have Union representation, but it is clear that the witness will not, and has not, conditioned his accepting reinstatement on being represented by the Union.

**11. Tony James**

James, a former Brown–Eagle employee, applied for employment with Brown & Root in May, 1998. After an extended period of unemployment, he currently works as a millwright helper by Kellogg Brown & Root at the E.I. DuPont de Nemours plant in Axis, Alabama. Initially, Mr. James was emphatic that, because Brown & Root did not want him in May, 1998, even with his perfect employment record and six and one-half years of experience, he had no intention of working for them now. However, Mr. James' resolve thawed markedly when, on cross-examination, he admitted that, if the Union returned also, he might go back to Brown & Root.

James' statements, in court and in affidavits procured by counsel for the Regional Director in April, 1998 and June, 1999 are contradictory. His testimony was thoroughly impeached by counsel for respondent and James was forced to admit that his opinion regarding Brown & Root vacillated considerably over the past year. In the April, 1998, he stated that he would willingly return; in June, 1999, he would not return come hell or high water; at the instant hearing, James stated that he would return to Brown & Root after all.

**Conclusions of Law**

**Availability of Injunctive Relief Pursuant to Section 10(j).**

In determining the legal standard under which a court determines whether a 10(j) injunction is just and proper, the Court was left, in large part, to its own devices, for the Eleventh Circuit has expressly declined to set forth a specific analytical framework. *Arlook v. S. Lichtenberg*, 952 F.2d at 371. The only guidance offered by the Eleventh Circuit is that a section 10(j) injunction will be just and proper when "any final order of the Board will be meaningless or so devoid of force that the remedial purposes of the [NLRA] will be frustrated." *Id., quoting Boire v. Pilot Freight Carriers*, 515 F.2d at 1192. The *Arlook* Court did recount situations where other courts have ruled that Section 10(j) injunctions were warranted—where organizational efforts are highly susceptible to being extinguished by unfair labor practices; when unions and employees have already suffered substantial damage from probable labor violations; and, when the violations reasonably found to have been committed will be repeated absent an injunction. *Arlook v. S. Lichtenberg*, 952 F.2d at 371; *citing e.g. Pascarell v. Vibra Screw Inc.*, 904 F.2d 874, 881 (3rd Cir. 1990); *Boire v. Pilot Freight*, 515 F.2d at 1194; *Szabo v. P\*I\*E Nationwide, Inc.*, 878 F.2d 207, 210 (7th Cir.1989). However, the Eleventh Circuit noted that the list was merely an example of situations where other circuits have held Section 10(j) injunctions to be appropriate and the Court noted that the list was neither exhaustive nor anything more than instructive. *Arlook v. S. Lichtenberg*, 952 F.2d at 371.

The Fifth Circuit offered some guidance, though cryptic, in stating that the threshold for granting injunctive relief under Section 10(j) is: first, that an injunction is an equitable necessity; and, second, that the Board had reasonable cause to believe that the NLRA was being violated. *Boire v. Intern. Broth. of Teamsters.*, 479 F.2d at 792.[10] It is not so clear, in reading the

---

10. The Fifth Circuit, in those halcyon days of labor litigation, set forth three separate two-

thoroughgoing examination of sections 10(j) and 10(*l*), what exactly the Court was discussing when it embarked on its reasonable cause analysis or what issue it was attempting to resolve. The genesis of the discussion, though, was the Teamsters' argument that the injunction should not issue against them because the Board's legal theory was novel and untested. It appears that, in discussing whether the Board had reasonable cause, the Fifth Circuit was constructing a framework for how closely the district court should examine the Board's legal theories—in essence discussing whether the Court should have dismissed the Board's claim altogether as being frivolous. In that and drawing an analogy to Section 10(*l*) proceedings, the Court instructed that, so long as the Board's claims are neither frivolous nor insubstantial, the district courts should go forward.

In ordering a hearing on this matter, this Court stated that it would rely on traditional equitable principals in determining whether an injunction was just and proper or an equitable necessity (Doc. 20). Neither Section 10(j) itself, nor any legislative history which this Court could find, indicates what precisely Congress meant by the words "just and proper." It is clearly-established that, while Congress

may exercise control over the exercise of judicial discretion and thereby command a departure from previous norms, courts should not merely assume such Congressional intent. *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), *quoting Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946). In referring to equitable relief, Justice James Wayne stated, "the great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction." *Brown v. Swann*, 35 U.S. (10 Pet.) 497, 503, 9 L.Ed. 508 (1836). Equitable remedies date back, with few changes, over hundreds of years, to days when the Courts of Chancery were organs of the Church and were charged with a duty to do that which is just. Congress was well-aware of those principles in 1947 when it passed the Taft–Hartley Act along with the provisions now in Section 10(j), yet neither then, nor at any time in the past half-century, has Congress seen fit to instruct the judicial branch to depart from these well-heeled equitable principles. *see e.g. Danielson v. Joint Bd. of Coat, Suit & Allied Garment Workers' Union*, 494 F.2d 1230, 1241–42 (2nd Cir.1974). This Court can discern no clear direction from Congress that it depart from equitable norms and in such absence, this Court will not do so willy-nilly.[11]

step analytical processes in its decision without any indication of which was appropriate or preferred. First, the Court stated that the district courts must find that (1) the Board has shown that the injunction is equitably necessary and (2) that the Board must have reasonable cause to believe unfair labor practices are taking place. *Boire v. Intern. Broth, of Teamsters*, 479 F.2d at 787.

Later in the same decision, the Court instructed that, "where the General Counsel's legal theories are substantial even if 'untested' or 'novel,'" the Court should (1) decide whether the injunction was necessary to preserve the Board's jurisdiction, and (2) decide whether it was equitably proper to grant relief. If the answer to each inquiry is 'yes,' then the injunction should issue. *Id.* at 789.

Finally, in 1975, the Court stated that the district courts should engage in the following analysis: first, determine whether the Board has reasonable cause to believe that unfair labor practices have occurred; and, second,

determine whether injunctive relief is equitably necessary or just and proper. *Boire v. Pilot Freight Carriers*, 515 F.2d at 1189.

Neither the Fifth Circuit, prior its the 1980 division, nor the Eleventh Circuit thereafter, had occasion to revisit this somewhat confounding course of affairs until *Arlook v. S. Lichtenberg* was decided in 1992. This Court can find no Eleventh Circuit decision dealing with a Section 10(j) injunction after *Arlook.'*

11. One District Court recently followed a similar procedure in employing traditional equitable principles in analyzing whether a Section 10(j) injunction is "just and proper." *D'Amico v. Townsend Culinary, Inc.*, 22 F.Supp.2d 480 (D.Md.1998). That Court noted, and this Court agrees, that courts may not "depart from the traditional test for equitable relief under the 'just and proper' language of Section 10(j) unless Congress had expressly, or by inescapable inference, otherwise sought to control the exercise of the court's discre-

■ Under traditional equity practice, the Regional Director bears the burden of showing: (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant is greater than any damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, will not disserve the public interest. *Cafe 207, Inc. v. St. Johns County*, 989 F.2d 1136, 1137 (11th Cir.1993); *Carillon Importers, Ltd. v. Frank Pesce International Group Limited*, 112 F.3d 1125, 1126 (11th Cir.1997); *see also United Industries Corp. v. Clorox Co.* 140 F.3d 1175, 1178–79 (8th Cir.1998). No single factor is dispositive, and each factor must be considered to determine whether the balance of equities weighs toward granting the injunction. *United Industries v. Clorox*, 140 F.3d at 1179.

■ One issue that the Court must address prior to engaging in its analysis is what injunction, if one were to issue, would be just and proper. The purpose of a Section 10(j) injunction is "to preserve the *status quo* while the Board procedures are in operation." *Boire v. Intern. Broth. of Teamsters*, 479 F.2d at 785. The *status quo* to be preserved is the last uncontested status which preceded the pending controversy. *Boire v. Pilot Freight Carriers*, 515 F.2d at 1194. What that *status quo* is, or was, however, is more difficult to pin down, but there is, after the Administrative Law Judge's ruling, a clear line of demarcation between Brown–Eagle and Brown & Root. The Administrative Law Judge ruled that Brown & Root did not violate the NLRA by changing the terms and conditions of employment, and, in the

doing tossing out the Brown–Eagle collective bargaining agreement.[12] Neither did Brown & Root's requiring all Brown–Eagle employees to apply anew for Brown & Root positions constitute a violation. Therefore, the unfair labor practices of which the Regional Director complains revolve around: (1) the manner in which Brown & Root conducted its initial hiring; (2) Brown & Root's refusing to recognize the Union; (3) Brown & Root's refusing to conduct collective bargaining; and, (4) the purportedly anti-union statements made by a Brown & Root manager.[13]

■ The Regional Director requested that this Court order (1) that Brown & Root offer immediate interim employment to all former Brown–Eagle employees, displacing, if necessary, all current Brown & Root employees who were not originally employed by Brown–Eagle; and, (2) that Brown & Root recognize the Union as the exclusive collective bargaining agent for the material handling workers and engage in collective bargaining. Given the particular circumstances, however, neither proposed retroactive relief would serve to preserve the *status quo* as of the time Brown & Root engaged in the alleged violations for, in a strictly technical sense, Brown & Root had no material handling employees at all when the company refused to hire some Brown–Eagle employees. The Court is troubled by the Regional Director's suggestion that it, in essence, overturn Brown & Root's takeover of Brown–Eagle's operations and thus force the former to accept, without exception, Brown–Eagle's employees as its own, and therefore, the Court finds that the Regional Director's first pro-

---

tion, which [Congress] has not done." 22 F.Supp.2d at 486.

**12.** The Regional Director has conceded that restoration of the terms and conditions of employment is no longer appropriate and, as such, has amended the petition for injunction to conform to the Administrative Law Judge's ruling.

**13.** Whether or not the Brown & Root manager made such statements is really no longer

relevant. Absent some evidence of a more concerted and organized anti-union campaign conducted by company officials, the Court finds that, in no case, can an injunction issue against an individual making such comments in the future. Neither can the Court envision a rehabilitative injunction which would result in Mr. Outlaw's recanting his statements to Brown–Eagle employees.

posed injunction would, in no way, be just and proper.

■ Moreover, the Regional Director's request that this Court order Brown & Root to recognize the Union as the workers' collective bargaining agent and to engage in collective bargaining is fraught with difficulty. In the main, and as the Fifth Circuit pointed out, while courts have not hesitated to issue interim bargaining orders where the union and the company had a pre-existing bargaining relationship which was being eroded by unfair labor practices, the situation is altogether different where the union's representative status has not been recognized. *Boire v. Pilot Freight Carriers,* 515 F.2d at 1194. That Court stated that an interim bargaining order, under the circumstances, would materially alter the *status quo,* imposing by judicial fiat a relationship that had never existed. *Id., citing Fuchs v. Steel–Fab, Inc.* 356 F.Supp. 385 (D.Mass.1973). As the Fifth Circuit refused to order interim collective bargaining in *Pilot Freight Carriers,* so too this Court will not do here.

The same reasoning prevents ordering Brown & Root to recognize the Union as the workers' exclusive collective bargaining agent for, as before, doing so would impose a relationship which, prior to the instant action, did not exist and, absent an injunction, would not exist. Not only has there never been a collective bargaining relationship between Brown & Root and the Union, the workers now employed by Brown & Root have not chosen the United Food and Commercial Workers Union, Local 1657 as their agent. This Court simply will not impose the Union upon Brown & Root's workers absent their consent, nor will the Court impose a relationship be-

tween the Union and Brown & Root by judicial fiat.

■ Instead, the Court finds that the only appropriate equitable remedy, the only injunctive relief that would be just and proper, and thus the logical starting point for analyzing whether injunctive relief is equitably necessary, is to order Brown & Root to start again from point zero—compel Brown & Root to conduct its hiring procedures again and from scratch.[14] Each former Brown–Eagle employee would then be required to re-submit an application; Brown & Root would have to re-conduct its testing and interviews; each potential employee would have to receive and accept an official offer of employment. Once that process is complete, should the Union have signed interest cards from the requisite percentage of Brown & Root employees, Brown & Root would be required to hold a union election and, if the vote is in the affirmative, recognize the Union and engage in collective bargaining.[15]

### Balancing of Equities

■■ It is clear that this Court may not decide, as a matter of law, either whether Brown & Root committed unfair labor practices or whether the Regional Director will succeed on the merits before the Board. Rather, this Court must determine whether the Regional Director has made a sufficient showing, having presented some evidence to support his unfair labor practice charge and an arguable legal theory, to meet the threshold requirement for showing a likelihood of success on the merits. *Miller v. California Pacific Medical Center,* 19 F.3d at 460. If it is an

---

**14.** The Court notes that there is one other injunction which may have been appropriate under certain circumstances—prohibiting Brown & Root from continuing to violate the NLRA. However, the Regional Director presented no evidence whatsoever that there are ongoing violations of the Act. In fact, it appears, though it is not firmly established, that Brown & Root is, at present, actively recruiting and hiring former Brown–Eagle employees for the material handling operations. For those reasons, the Court finds that a prohibitive injunction would not be just and proper.

**15.** As George Seidenfeden readily admitted, *his* union local need not necessarily be *the* union with which the material handling employees affiliate. Rather, should union recognition, either now or upon a ruling from the Board, come about, then the choice of *a* union would reside wholly with the workers.

absolute metaphysical certainty that the Regional Director will succeed on the merits—that is, if Brown & Root had admitted to the substance of the unfair labor practice charge—then the Court may presume that the Regional Director will suffer irreparable injury. *Id.; NLRB v. Electro–Voice,* 83 F.3d at 1567–68. The Regional Director has made a sufficient showing as to the factual and legal basis of his charge but, because the charge is disputed, then the Court must consider the possibility of irreparable injury. *Miller v. California Pacific Medical Center, Id.*

■■■■■ In examining whether the Regional Director has come forward with sufficient evidence that irreparable harm will ensue absent the requested injunctive relief, the Court does not look to some harm to the individual employees. Rather, the Court should determine whether there will be irreparable harm to the collective bargaining process or to other protected employee activities if the remedy must await the Board's final decision. *Sharp v. Parents in Community Action, Inc.,* 172 F.3d at 1038; *Miller v. California Pacific Medical Center,* 19 F.3d at 460–61. In essence, an injunction should issue, assuming that the other two requirements for equitable relief are met, if the Regional Director can show that the collective bargaining process will suffer irreparable injury unless the Board can fully implement its final decision. Throughout, the Court must be mindful that Section 10(j) is, and remains, an extraordinary remedy to be employed only when an employer or union has engaged in such "egregious unfair labor practices that any final order of the Board will meaningless or so devoid of force that the remedial purposes of the NLRA will be frustrated." *Boire v. Pilot Freight Carriers,* 515 F.2d at 1192.

■■■■ The Regional Director has failed to establish the requisite potential for irreparable injury. It is clear to this Court that, of the witnesses called to testify on behalf of the Petitioner, most would accept a job offer from Brown & Root—some would do so unconditionally, some would take the job if the Union returned with them. Likewise, it is quite clear that the Regional Director has utterly failed to establish any likelihood whatsoever that the former Brown–Eagle workers will, as the Regional Director put it, "scatter to the four winds." Rather, it seems entirely probable that the Brown–Eagle workers will remain where they are—most are residents of south-west Alabama, with many residing within twenty miles of the CIBA facility. Virtually all the Brown–Eagle workers have family and social ties to the McIntosh area. A great many of the witnesses expressed considerable satisfaction with their material handling positions and several stated that they would leave other, in some cases better-paid, positions to return to those jobs at the CIBA plant. In short, the Court finds that there is little likelihood that Brown & Root will be able to thwart implementation of a Board order by simply waiting and doing nothing while the Board dithers.

As a secondary matter, in most cases involving Section 10(j) injunctions, the circumstances have been such that there was an ongoing attempt either to unionize a company or to engage in collective bargaining. The unfair labor practices, either on the company side as is most often the case, or on the union side as was the case in *Boire v. Intern. Broth. of Teamsters,* have been immediate and continuing. Here, there is no such situation. Brown & Root took over certain operations. The company conducted all hiring afresh using a field hiring manual. The alleged unfair labor practice occurred neither in the takeover nor in the decision to make Brown–Eagle's workers apply for their positions. Rather, the alleged unfair labor practices were based on isolated allegedly anti-union comments of a Brown & Root manager and the allegation that Brown & Root failed to follow its own field hiring manual in some instances.

There is no credible evidence of any continuing anti-union activities at Brown & Root's material handling facility. Though

several witnesses stated that they thought or believed that engaging in pro-union activities would bring on adverse employment actions, the record is devoid of any substantive anti-union animus on Brown & Root's part on which the workers might base those opinions. In fact, both the Union and the workers have been, and continue to be, utterly somnolent. In the time since Brown & Root took over the material handling operations, the Union has done absolutely nothing to maintain a presence in the Unit. As Mr. Seidenfeden testified, the Union has made no attempts to contact either current Brown & Root employees or former Brown–Eagle employees save in preparation for the hearing. The Union has not kept in touch with the employees it formerly represented; it has not kept those members informed regarding the progress of the case, either before the Administrative Law Judge or before this Court; neither the Union nor the pro-union workers at Brown & Root have held a single meeting regarding the situation at Brown & Root; the Union has not attempted to conduct intelligence-gathering operations in preparation for an attempt to force Brown & Root to recognize the Union.[16] In short, the Union has decided to do nothing and the employees it purports to represent have followed suit. The Court finds that there are not now, and have not been, any protected activities which Brown & Root has attempted to squelch through unfair labor practices.

Still and all, the Court believes that it must also look to the final two factors in the equitable analysis before finally determining whether an injunction is equitably necessary. It is clear to this Court that, as the Regional Director has failed to establish the requisite irreparable harm, then any harm suffered by Brown & Root will surely outweigh that suffered by the Board if the parties are forced to wait for a final decision on the merits. Requiring

Brown & Root to conduct its hiring procedures over again will force the company to incur significant expense—both in outlays of money and in lost productivity due to the delays that would be inherent in going through those motions. Additionally, the Court notes that such an order would cause considerable hardship to those employees, both former Brown–Eagle workers and new hires, who would be required to re-apply for their jobs, lose wages and benefits while the hiring process was ongoing, and would suffer what the Court considers to be significant anxiety while waiting for Brown & Root's decision. The Court finds that the hardships balance decidedly against granting injunctive relief.

Finally, the Court must examine whether an injunction would be against the public interest. It is well-settled that the public has an interest protecting the remedial powers of the Board. *Miller v. California Pacific Medical Center,* 19 F.3d at 460. It is clear to the Court that the public also has an interest, however ephemeral, in seeing that peaceable relations are maintained in the age-old struggle of labor-management relations. However, neither public interest will be offended should the Court refuse to issue an injunction. Moreover, were this Court to issue an injunction, it would almost surely offend an altogether separate, yet nevertheless important, public interest: that interest in ensuring that the federal judiciary not wantonly meddle in private business affairs; the interest which mandates that the federal courts act judiciously and with restraint where exercising the not inconsiderable power of the judicial branch; public interests which are particularly powerful where the remedy sought is a matter left to sound judicial discretion. There is simply no indication that an injunction pursuant to Section 10(j) would be in the public interest.

---

16. According to Mr. Seidenfeden, all such activities were commonplace when the Union expected a fight with a company, and he indicated that, where the Union was attempting to organize in a company, there were highly developed and elaborate strategies, including visiting workers at home and maintaining contact with them, designed to foster union sympathies.

## CONCLUSION

For the foregoing reasons, the Court finds that no injunctive relief is just and proper under the circumstances. The Regional Director, having shown at least the mere possibility of success on the merits, has failed to show that either the collective bargaining process itself, or the Board's remedial power will suffer irreparable harm should the parties be forced to wait for the final decision of the Board. Furthermore, it is clear to this Court that the hardships balance firmly against issuing the requested injunctive relief. Finally, there is no public interest which would merit issuing an injunction and a strong public interest against granting such relief.

Having considered the matter, then, it is hereby **ORDERED** that Brown & Root's Motion for Judgment on Partial Findings be **GRANTED** and the Regional Director's Petition for Injunctive Relief be **DISMISSED** with **PREJUDICE**.